IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 1:23-CR-91-CMH |
| v. | ) | |
| | ) | Count 1: 18 U.S.C. § 1343 |
| BENNIE EARL MAGEE, | ) | (Wire Fraud) |
| | ) | |
| Defendant. | ) | |
| | ) | **Forfeiture Notice** |

INFORMATION

Count 1

(Wire Fraud)

THE UNITED STATES ATTORNEY CHARGES THAT:

At all times relevant to this Information:

1. Defendant BENNIE EARL MAGEE ("the defendant" or "MAGEE") resided and worked in Manassas, in the Eastern District of Virginia, where he maintained a home office as well as a business location.

2. MAGEE controlled numerous companies that had been incorporated in Virginia, including but not limited to, INFINITY SOLUTIONS GROUP, LLC.

3. As further described below, MAGEE submitted COVID-19 relief loan applications for his own business entities and for entities belonging to Individuals M.G. and J.S., to a financial institution and to the Small Business Administration ("SBA").

4. MAGEE's entities and the entities of M.G. and J.S. had bank accounts at TD Bank, a federally insured financial institution as defined in 18 U.S.C. § 20.

1

*EIDL and PPP Programs*

5. In response to the economic crisis caused by the coronavirus pandemic, the SBA made government-guaranteed loans available to qualified small businesses through the Economic Injury Disaster Loan ("EIDL") program. The purpose of EIDLs was to enable small businesses to meet financial obligations and operating expenses in light of the pandemic. To qualify for an EIDL, an applicant had to meet certain criteria, including, among other things, that it was in operation prior to the pandemic, and had regular operating expenses, which the applicant would have paid if not for the pandemic. Moreover, the amount of the loan that could be approved under the EIDL program typically was a function of the applicant's working capital. The proceeds of an EIDL could be used for working capital and normal operating expenses.

6. Also, in response to the economic crisis caused by the novel coronavirus pandemic, in or around March 2020, Congress made government-guaranteed loans available to qualified small businesses through the Paycheck Protection Program ("PPP"). The purpose of loans issued under the PPP was to enable small businesses suffering from the economic downturn to continue to pay salary or wages to their employees. Eligible businesses seeking a loan under the PPP could apply for such a loan through a federally insured depository institution. To qualify for a loan under the PPP, an applicant had to meet certain criteria, including, among other things, that it was in operation on February 15, 2020, and either had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on an IRS Form 1099-MISC. Moreover, the amount of the loan that could be approved under the PPP and implementing regulations typically was a function of the applicant's historical payroll costs.

7. The proceeds of a PPP loan could be used only for certain specified items, such as payroll costs, costs related to the continuation of group health care benefits, mortgage interest

payments (but not mortgage prepayments or principal payments), rent payments, utility payments, interest payments on debt obligations that were incurred before February 15, 2020, or for refinancing certain specified SBA loans.

8. Second round or "second draw" PPP loans were made available by 2021. Among other things, second draw PPP loans required showing continued payment of payroll to employees. For loans over $150,000, applicants were required to show a decline in quarterly revenue from 2019 to 2020 of at least 25%.

9. The SBA paid lenders a processing fee of 1–5% on all PPP loans, with the percentage based on the size of the loan, as compensation. Once TD Bank approved and disbursed a PPP loan to MAGEE, the SBA paid the lender a processing fee of 1–5% based on the amount of the loan. In total, MAGEE applied for or assisted in the application process for 26 PPP loans across 17 entities. The SBA paid $270,092.71 in processing fees to TD Bank for these 26 loans.

10. Recipients of PPP loans could then apply for loan forgiveness, which would forgive the entire loan balance upon a showing by the borrower of appropriate use of the PPP funds. Loans not forgiven were subject to repayment. The SBA guaranteed 100% of the outstanding loan balance, and that guarantee was backed by the full faith and credit of the United States.

*The Scheme to Defraud and Its Manner and Means*

11. From at least in or around April 2020 through at least in or about September 2021, in the Eastern District of Virginia and elsewhere, the defendant did knowingly in connection with COVID-19 relief loan applications, apply for in the name of various business entities, devise and participate in a scheme and artifice to defraud a financial institution and the SBA, and to

3

obtain money and property from them by means of materially false pretenses, representations, and promises, through the use of the interstate wires.

12. In furtherance of the scheme, MAGEE would prepare first draw and second draw PPP loan applications that he would submit online to a financial institution and the SBA from his home office in Manassas, Virginia.

13. On loan applications, MAGEE would materially inflate the numbers of employees each entity had, falsify quarterly and annual payroll expenses, and falsify annual revenues for each company.

14. MAGEE would create and submit to the lender fictitious IRS tax returns and payroll documents in support of the first draw PPP loan applications. The falsified tax returns would be backdated, bear signatures of MAGEE and Individuals M.G. and J.S., as needed, and contain fabricated and falsified information concerning numbers of employees paid, withholding taxes withheld and paid, and total payroll.

15. MAGEE would seek loan forgiveness for the entities by falsely certifying that the PPP money had been used either solely for payroll or solely for other authorized purposes such as payroll, rent and utilities. MAGEE would inflate the number of employees supposedly receiving payroll for each entity on the loan forgiveness applications. In some instances, MAGEE would fabricate false documentation to show that funds were used as required by the program. MAGEE falsified TD Bank statements to show that PPP loan funds were used for rent or utilities and supplied updated false payroll summary documents.

16. It was an object of the scheme to obtain EIDL and PPP loans for the purpose of investing in crypto currency ventures and to spend the money on purposes not authorized by the PPP and EIDL programs, respectively.

*Execution of the Scheme*

17. For the purpose of executing the aforementioned scheme and artifice to defraud and attempting to execute such scheme, the defendant,

**BENNIE EARL MAGEE,**

did knowingly transmit and cause to be transmitted writings, signs, signals, and sounds by means of wire communications in interstate and foreign commerce, to wit: the defendant, using a computer in the Eastern District Virginia, applied online to the SBA's portal via a server located outside the Commonwealth of Virginia, for an EIDL on behalf of INFITITY SOLUTIONS GROUP, LLC., falsely representing the material facts that the entity had 15 employees in 2019 and $1,944,804 in gross 2019 revenue, when in truth and in fact, as the defendant well knew then, the entity had few if any employees and actual revenues were far below what he represented.

(All in violation of Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE NOTICE

Pursuant to Federal Rule of Criminal Procedure 32.2(a), Defendant BENNIE EARL MAGEE is hereby notified that, if convicted of wire fraud as alleged in Count 1 of this Information, the Defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(A), any property constituting, or derived from, proceeds obtained directly or indirectly, as a result of the violation in Count One. If any property that is subject to forfeiture is not available, it is the intention of the United States to seek an order forfeiting substitute assets pursuant to 21 U.S.C. § 853(p) and Fed. R. Crim. P. 32.2(e). The property subject to forfeiture includes but is not limited to the following: a sum of money equal to at least $5,292,944 in United States currency, representing the amount of proceeds obtained as a result of the offense in Count One.

(In accordance with Title 18, United States Code, Section 982(a)(2)(A); and Rule 32.2(a), Federal Rules of Criminal Procedure.)

Jessica D. Aber
United States Attorney

By: *[signature]*
Russell L. Carlberg
Assistant United States Attorney