IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BENNIE EARL MAGEE,<br><br>Defendant. | Case No. 1:23-CR-00091-CMH<br><br>The Honorable Claude M. Hilton<br><br>Hearing: September 8, 2023 |

## AMENDED POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The United States of America, through its undersigned counsel, in accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Commission Guidelines Manual ("Guidelines" or "U.S.S.G."), hereby submits its position with respect to sentencing of Bennie Earl Magee ("the defendant" or "Magee"). The defendant comes before the Court for sentencing after pleading guilty to one count of wire fraud in violation of Title 18, United States Code, Section 1343. With the exception of acceptance of responsibility, the United States concurs with the Probation Officer's calculations of the defendant's Sentencing Guidelines range as set forth in the Presentence Investigation Report ("PSR"). *See* PSR ¶¶ 89-103, 132-33. For the reasons set forth below, the United States respectfully submits that a term of imprisonment within the applicable guideline range, adjusted for acceptance, would be reasonable and appropriate in consideration of all of the factors set forth in 18 U.S.C. § 3553(a). That range is **121-151 months (offense level 32, criminal history category I)**.

### I. BACKGROUND

The purpose of the paycheck protection program was to allow active companies adversely impacted by COVID-19 to continue to make payroll to documented employees. The purpose of

1

the EIDL program was to assist businesses to maintain current operations. Not long after these programs were announced, Magee concocted a scheme to defraud the United States and lending institutions of over $7 million in pandemic relief funds under both the PPP and EIDL programs. Magee lost large amounts of the fraud proceeds in crypto currency speculation. He also spent it on vehicles and other vanity projects.

Magee's criminal conduct was extremely willful and flagrant. It would have been bad enough had he exposed only himself to criminal prosecution, but he misused his position of trust within his family circle and through longtime friendships to corrupt others, like Michael Gilcher and Magee's own brother-in-law, Individual J.S. These people would never have engaged in the fraud but for Magee's insistence, his leadership, and his promises of no consequences and free money.

Magee executed his scheme by offering co-conspirators (e.g., Gilcher), unsophisticated family members (e.g., Individual J.S.), and people he perceived as friends (e.g., Confidential Witness), his services in executing the fraud. These services included filling out loan application forms with false information; fabricating IRS tax returns with detailed false information in terms of employee withholding taxes and payroll; falsifying payroll records; and creating completely falsified profit/loss statements. Magee also promised that nobody would need to repay the loans since he would submit additional falsified records to qualify himself and others for loan forgiveness. In exchange for these criminal services, Magee requested around half of the proceeds gained from the fraudulent PPP loans.

Magee was most prolific in executing loan fraud for his own many entities, all of which were basically his alter egos. Of the 11 companies Magee controlled, only two appear to have had any recent real business operations. The other nine were essentially dormant or minimally active

entities. Every single EIDL and PPP loan application that Magee submitted on behalf of these entities was riddled with fraudulent information, whether or not the company did any actual business.

Magee, laboring in his home office in Manassas to make the documents sophisticated enough to fool lenders, obtained over $5 million for himself, and over $7 million in total (including the loans Magee completed for Gilcher and for Individual J.S.). He then blew portions of these millions on reckless crypto currency speculation makes the fraud all the more outrageous.

## II.  GUIDELINES CALCULATION

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, it held that a sentencing court must "consult [the] Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); s*ee also United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006). The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also "consider all of the [18 U.S.C.] § 3553(a) factors" in determining the appropriate sentence. *Id.* at 49–50; *see also Clark*, 434 F.3d at 685.

### A.  The Base Offense Level and Loss Amount

The base offense and loss enhancement are not in contention. As agreed in the plea agreement, the base offense level is 7, and the actual loss amount is over $7 million. As such, an 18-level enhancement for the loss amount is proper under U.S.S.G. § 2B1.1(b)(1)(J).

### B.  More than $1 Million in Gross Receipts from a Financial Institution

There is no factual dispute that Magee through his entities personally derived substantially over $1 Million dollars from TD Bank, a federally insured financial institution. Accordingly, the

3

two-level enhancement under 2B1.1(b)(17)(A) applies. *See* PSR ¶ 93.

### C. Sophisticated Means

Magee certainly used sophisticated means to execute the scheme to defraud. He did far more than simply fill out application forms. His scheme took considerable planning. It required the use of multiple interlocking, fabricated documents to create a convincing illusion of functioning companies with employees, payroll, payroll taxes, expenditures of goods, income, profit and losses. It must have taken Magee many days hunched over his computer in his spacious house to create his web of lies for over a dozen entities, covering first and second draw PPP loans, EIDL loans, and fraudulent loan forgiveness applications and supporting documents.

Magee's scheme operated with the type of multilayered sophistication that the Fourth Circuit has found to satisfy the sophistication enhancement. *See United States v. Davis*, No. 18-4080, 2018 WL 5096070, at *1 (4th Cir. Oct. 18, 2018) (unpublished) (affirming application of the sophisticated means enhancement applies where the defendant created a "multilayered scheme" and "used numerous means to conceal the fraud, including forgery, altering documentation, transferring money between accounts, and omitting property from certain accountings"). As described collectively in the PSR and the Statement of Facts, the defendant used a sophisticated set of interlocking transactional documents to simulate real businesses, with real employees, taxes, profits, and losses. He did it for many, many entities.

Magee's conduct certainly warrants the two-level enhancement for sophisticated means. "The enhancement requires some means of execution that separates the offense from the ordinary or generic." *United States v. Jinwright*, 683 F.3d. 471, 486 (4th Cir. 2012) (tax case). "On the other hand, a defendant need not utilize the most complex means possible to conceal his fraudulent activities in order for the court to find that he used sophisticated means." *Id*. (internal citations

4

omitted).

### D.      The Defendant's Role in the Offense

The Probation Officer is correct that defendant was an organizer and leader of criminal activity involving five or more participants or was otherwise extensive. Accordingly, a four-level adjustment is applicable under §3B1.1(a).  PSR ¶¶ 82.83, 95. In applying this enhancement, among the factors a sentencing court should consider are: the degree to which the defendant understood the scope and structure of the criminal activity; the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and the degree to which the defendant stood to benefit from the criminal activity. § 3B1.1 note 4.

The crimes at issue in this case involved a number of participants. "A 'participant' is a person who is criminally responsible for the commission of the offense but need not have been convicted."  § 3B1.1 note 1.  There are two criminally charged participants in this case: Magee and Gilcher. Additionally, there is at least one uncharged person who engaged in the scheme with Magee: Individual J.S.  These people obtained loans using the same *modus operandi,* all conducted by Magee, and shared funds back with Magee, at his direction and control.

Magee's conduct fits perfectly with the "otherwise extensive" clause of the enhancement. The application note explains:

> In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered.  Thus, a fraud that involved only three participants but used the unknowing services of

5

many outsiders could be considered extensive.

§ 3B1.1 note 3. Here, there are three persons with serious criminal and civil exposure. Further, Magee used the identities of numerous real people to falsely portray them to lenders as his employees to obtain the loans that he claimed he needed for their payroll. Finally, bank employees' dedicated their time and attention to these fraudulent loans and forgiveness packages. They were unknowingly used to execute the scheme.

The defendant managed and supervised Gilcher and Individual J.S. There is no doubt that Magee's "friends and family" fraud scheme would not have taken shape but for Magee's impetus, direction, and control. Magee is truly the leader and organizer of this extensive scheme and its participants. The government's financial analysis has shown that the defendant reaped the greatest portion of the overall funds obtained in this case: over $5 million of the $7 million in proceeds. He profited handsomely from the criminal activity. His outsized take of the proceeds is another factor that Courts consider in applying the guideline.

In contrast to the facts on the record in *United States v. Slade*, 631 F.3d 185, 190-92 (4th Cir. 2011), here the evidence of significant control, management and direction is very clear. At minimum, the defendant exercised at least the degree of managerial and supervisory role in this scheme that the Fourth Circuit found merited the three-level enhancement in *United States v. Bartley*, 230 F.3d 667, 673-74 (4th Cir. 2000). There is simply no denying that Magee coordinated the nature, manner, and timing of how this extensive scheme was executed, and that Magee effectively controlled Gilcher and Individual J.S.

### E. Obstruction of Justice

The government agrees with the Probation Officer that a two-level enhancement applies under §3C1.1. See PSR ¶¶ 84, 96. As Application Note 3 to this guideline notes, "[o]bstructive conduct can vary widely in nature, degree, planning, or seriousness." USSG § 3C1.1, cmt. 3.

Here, Magee, after the FBI executed a search warrant, fabricated a false lease agreement between his entity, Bull Run Capital Investments, LLC, and Gilcher's entity, Infinity Communications Solutions, LLC. This economically absurd rental agreement (over $15,000 a month for a business with no tiny amounts of revenue) papered over Gilcher's kickback to Magee of nearly 50% of the fraud proceeds. By disguising the huge payments to Bull Run as a legitimate debt payment, rather than the kickback it was, Magee hoped to fool the lender into forgiving Gilcher's two PPP loans. He also appears to have believed he would look less culpable to the government and to this Court if he were receiving legitimate back rent payments from Gilcher versus simply taking half of the fraud proceeds as his cut for leading the scheme. Perhaps Magee also was aware of a whistleblower allegation about his pitching the scheme to others in exchange for a 50% cut of the proceeds and perpetrated this lie to minimize his exposure.

But Magee did not stop with simply creating the fake document. Magee stuck with the lie when he himself came into the U.S. Attorney's Office to discuss the case with prosecutors and agents. He also, most egregiously of all, pressured and suborned Gilcher into coming into the U.S. Attorney's Office and lying to agents and the undersigned AUSA. That Gilcher would do so illustrates the degree of control Magee exercised over Gilcher from the very start of the entire scheme.

This is not a "he said" versus "he said" situation. Gilcher risked his acceptance of responsibility by coming clean with the government and Probation with respect to this material lie. The undersigned AUSA knows that Gilcher and his attorney were very trepidatious about sharing the truth of the situation with the government, but they wanted to be totally straight and honest with the Court and the government in this process. The same certainly cannot be said for Magee.

7

In sum, Magee's obstructive conduct fits closely with several of the examples of covered conduct cited under Application Note 4. *See* USSG § 3C1.1, cmt. 4 (A), (B), (C), (G) & (H). For these reasons, the obstruction enhancement applies.

### F.     Acceptance of Responsibility

The United States does not dispute the reasonableness of the Probation Officer's denial of acceptance of responsibility in light of the defendant's obstruction of justice. That said, the defendant still did own up to most of the criminal conduct. He did plead pre-indictment and has saved the government considerable resources by pleading rather going to trial. For those reasons, and to honor the plea agreement, the government asks that the Court apply the two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and, in accordance with the plea agreement, hereby moves for the additional one-point reduction under U.S.S.G. § 3E1.1(b).

### III.    IMPOSITION OF SENTENCE

Pursuant to 18 U.S.C. § 3553(a), the Court should consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to, among other things, reflect the seriousness of the offense and adequately deter criminal conduct; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense.  Ultimately, the sentence imposed must meet a standard of reasonableness.  *See Booker*, 543 U.S. at 260–61.  The advisory guidelines range is an important starting point because it captures the seriousness of the offense. *United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2007) ("[T]he Guidelines reflect a carefully considered assessment of the seriousness of federal crimes").

Likewise, "[t]he fact that § 3553(a)[(4)] explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *United States v. Langford*, 516 F.3d 205, 211-12 (3d Cir. 2008) (quotation omitted). Moreover, "the authors of the Guidelines, no less than district courts, have been tasked with ensuring that criminal sentences meet the goals of sentencing set forth in § 3553(a)," *United States v. Merced*, 603 F.3d 203, 221-22 (3d Cir. 2010), and have prepared "Guidelines that seek to embody the § 3553(a) considerations," *Rita v. United States,* 551 U.S. 338, 347-50 (2007). 28 U.S.C. §§ 991(b)(1)(A), 994(f).  In general, then, "a within-guidelines range sentence is more likely to be reasonable than one that lies outside the advisory guidelines range[.]" *Goff*, 501 F.3d at 257 (quotation omitted).

Based on all these factors a guideline sentence is appropriate in this case. There is little that is truly mitigating here that would warrant a substantial downward variance.

A. **The Nature, Circumstances, and Seriousness of the Offense**

The COVID-19 pandemic has claimed over one million American lives, and many more world-wide. It disrupted life profoundly. We were fortunate to live in a country with resources to mitigate the worst of it. Among other actions to combat the pandemic, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act, more commonly known as the "CARES Act." Pub. L. No. 116-136, 134 Stat. 281 (2020). The law sought to alleviate the massive suffering caused by the pandemic and the damage to the economy caused by resulting sudden, widespread lockdowns. The terms of the Act were generous by design: it made billions of government-guaranteed loans available to qualified small businesses through the Paycheck Protection Program ("PPP"). The loans would carry the exceptionally low interest rate of 1% if they came due at all. And the loans would be forgiven entirely so long as the proceeds were used

on a narrow list of expenses designed to help struggling businesses survive: payroll, utilities, rent, premiums to keep health care benefits in force, and just enough to pay the interest (but not the principal) on a company's pre-existing mortgage or other business loan.

To qualify for a PPP loan, an applicant had to meet certain criteria that were designed to ensure that the program's assets would be used to forestall widespread layoffs and economic collapse. A business applying for a PPP loan was required to certify, among other things, that it was "in operation on February 15, 2020 and either had employees for whom [it] paid salaries and payroll taxes or paid independent contractors, as reported on a Form 1099-MISC."[1] The amount of the loan that could be approved under the program was a function of the applicant's historical payroll costs, subject to certain exclusions. Again, the intent of the Act and its implementing regulations were to alleviate widespread economic suffering caused by the pandemic, by giving companies enough money to pay the absolute essentials.

While millions of Americans were struggling, Magee plotted from his palatial home to obtain dozens of PPP loans and EIDL loans and grants by fraud. Magee fabricated payroll reports. He made entirely from whole cloth backdated and preposterous IRS Forms 940 and 941, falsely claiming his businesses had paid millions in payroll to fictious employees, even claiming they had withheld and paid over to the IRS substantial employee withholding taxes. None of that was true. This was fraud and deceit willingly and enthusiastically told to obtain essentially free government money.

But this money has not been free to taxpayers, nor has such large, extensive fraud like this been cost-free to the country. As a result of all the easy money, much obtained by fraud, for a period of time the economy suffered from inflation the likes of which had not been seen since the

---

[1] PPP Borrower Application Form, Certifications, page 2, SBA Form 2483 (04/20).

1970s. The willful actions of people like Magee, who rushed in to take as much low-interest money as possible, by fraud, and then injected it into the economy without contributing much of anything productive in the process, certainly did not help matters.

Magee freely chose to commit these crimes. He had other options available. After all, banks offer other types of loans – like a business loan, or a personal line of credit, but you have to tell the truth; you have to pass due diligence; maybe you have to pay a real interest rate and be expected to put up collateral and to pay it back. Magee has had significant financial resources, living in an expensive home. He did not need to commit this crime. This was hardly a crime of necessity. It was entirely a crime of choice – of opportunistic greed.  For that reason, this defendant, the leader of this scheme, deserves real, meaningful punishment.

> **B.** **The Defendant's History and Characteristics and the Need for Specific Deterrence**

The history and characteristics of the defendant support a meaningful carceral sentence. Although the defendant has no scored criminal history, the scope of the scheme, the sheer number of fraudulent loans at issue, the leading role the defendant played in the scheme, all suggest he needs to receive a substantial jail sentence to drive home the message that these sorts of crimes do not pay. Indeed, the Sentencing Commission noted in its "background" commentary to § 3B1.1 that the upward adjustment for leadership, in part, is based on the view that persons who organize and lead extensive criminal conduct involving multiple individuals inherently pose a higher risk of recidivism. For the same reasons, this defendant's history and characteristics under § 3553(a)(1) counsel in favor of a significant jail sentence. The brazenness of the conduct, as revealed in the sheer number of fraudulent loan applications at issue, support this conclusion.

Magee constructed a small personality cult around himself that he used to take in naïve and gullible people like his brother-in-law, Individual J.S., as well as his protegee, Michael Gilcher.

11

Individual J.S. was essentially a blue-collar worker. Magee managed Individual J.S.'s financial affairs and had unfettered access to his banking and business information. Gilcher was similarly taken in with Magee. Both men described to law enforcement the awe in which they held "Dr. Magee." Magee displayed the trapping of business acumen, evidenced by his vehicles and his house in Manassas, complete with a large portrait of himself hanging in the house. To unsophisticated folks, it was quite a sight. So, when Magee concocted his COVID fraud scheme, he was able to manipulate Gilcher and Individual J.S. into the scheme with ease.

The extensiveness of Magee's crimes in the case, including the psychological sway Magee held over others, all counsel in favor of a substantial period of incarceration. This is needed to incapacitate Magee from committing further crimes. Magee's conduct should cause concern about future recidivism.

### C.   Need to Deter Future Criminal Conduct and Promote Respect for the Law

A significant, but not excessive sentence, is also called for in this case to promote general deterrence. Absent a meaningful term of imprisonment, general deterrence — "the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow"—will not be achieved. *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976). The Court must also consider how to deter others as a general matter from engaging in similar conduct. *See, e.g.*, *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionally minimized.").

EIDL and PPP loan frauds in general, and this crime in particular, are deliberate and calculated crimes of choice. They are therefore more susceptible to general deterrence and more

in need of a significant sentence to achieve that deterrence. *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (finding that crimes that are "rational, cool, and calculated" rather than "crimes of passion or opportunity" are "prime candidates for general deterrence") (citation omitted). Moreover, crimes like this are lucrative and can be difficult to detect. As shown here, Magee made over $5 million for himself from this scheme, making this crime a very attractive option for would-be fraudsters, unless there is a meaningful threat of a lengthy term of incarceration. *See, e.g., United States v. Hefferman*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.")

A significant sentence is, therefore, necessary to send the appropriate message to Magee—and more importantly, to others, and to the public, that those who engage in conduct this stunning and brazen in scope will be caught and punished significantly. And this type of fraud appears to have been rampant: as much as $400 Billion in PPP funds and $80 Billion in EIDL funds were stolen by people like Magee.[2]

Absent a significant jail sentence, the public would be right to wonder whether the rule of law truly has any teeth. Defendants who so brazenly scam relief funds the way this defendant did deserve significant sentences.

D. **Avoid Unwarranted Sentencing Disparities**

Magee is the leader and prime mover of this extensive scheme. Thus, a sentence pegged to

---

[2] "'Biggest Fraud in a Generation:' The looting of the Covid relief plan known as PPP," by Ken Dilanian and Laura Strickler, NBC News, March 28, 2022, available at https://www.nbcnews.com/politics/justice-department/biggest-fraud-generation-looting-covid-relief-program-known-ppp-n1279664 (last visited June 29, 2022) (quoting Department of Justice, Secret Service, and Small Business Administration estimates).

13

the guidelines is less likely to create future sentencing disparities. That is because, as the Seventh Circuit has noted, "[s]entencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly." *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) (noting light sentence for cooperating defendant was appropriate and lengthy sentence for defendant who did not was appropriate, and was not a disparity, but a justifiable difference); *see also United States v. Matthews*, 701 F.3d 1199, 1205 (7th Cir. 2012) (*quoting United States v. Smith*, 510 F.3d 603, 610 (6th Cir.2010)) ("To find an unwarranted disparity in this case would allow defendants to bind district courts according to the most lenient sentence that another court had imposed for a similar crime.")."

## IV. CONCLUSION

Based on the 18 U.S.C. § 3553(a) factors, a guideline sentence, as well as orders of restitution and forfeiture, and a three-year term of supervised release, are necessary and entirely appropriate in this case.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By: /s/ Russell L. Carlberg
Russell L. Carlberg
Kathleen Robeson
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3868
Facsimile: (703) 299-3980
Email: Russell.L.Carlberg@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on September 1, 2023, I caused a copy of the foregoing memorandum to be filed with the Clerk of Court using the CM/ECF system, which will automatically generate a Notice of Electronic Filing (NEF) to all counsel of record.

A copy has also been sent via email to:

Rachael Meyer
United States Probation Officer
Rachael_Meyer@vaep.uscourts.gov

_____
Russell L. Carlberg
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3868
Facsimile: (703) 299-3980
Email: Russell.L.Carlberg@usdoj.gov