IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **Case No. 1:23-cr-00091-CMH** |
| **v.** | ) | |
| | ) | **The Honorable Claude M. Hilton** |
| **BENNIE EARL MAGEE,** | ) | |
| | ) | **Sentencing Hearing: September 8, 2023** |
| **Defendant.** | ) | |

<u>**DEFENDANT'S POSITION ON SENTENCING**</u>

Bennie Earl Magee has come a long way from his humble beginnings in Gulf Port, Mississippi. He put himself through college and graduate school. He served his country in the United States Army and earned the privilege to serve in the historic and prestigious Old Guard. He began and ran several companies that employed friends, family, and members of the community. He is a devoted husband and he and his wife have raised four great children. He has mentored countless kids, has assisted friends and family going through difficult times, and has contributed both his time and money to his community. In many ways, Mr. Magee is the personification of the opportunities this country and government provides to those willing to work for them.

But Mr. Magee would be the first to admit he is far from perfect. Nowhere are his imperfections more on display than in the actions he took that brought him before this Court as a first-time felon at age 55. In response to the COVID-19 pandemic that swept the globe beginning in 2020, Mr. Magee admittedly took advantage of the financial relief the government offered through the Paycheck Protection Program ("PPP") and the Economic Injury Disaster Loan ("EIDL") program. He did so by falsely certifying inflated employee, payroll and tax records on

1

behalf of several of his businesses and obtained far more money than he otherwise would have had he provided truthful information.

As a result, he will lose just about everything he has ever earned over a lifetime of hard work and overcoming odds.  He will lose money, property, companies, and friends.  He will lose his freedom.  And, he has lost his reputation.  A reputation built over decades of building relationships and trying to be a positive force in the lives of others.  In recognition of the seriousness of his criminal conduct as well as his compelling personal history and service to his country, and for all the reasons that follow, Mr. Magee respectfully asks this Court to impose a sentence of 48 months of incarceration.

## I.      THE BASELINE ADVISORY SENTENCING GUIDELINES RANGE

The statutory maximum punishment for Mr. Magee's offense on Count 1 is imprisonment for up to thirty (30) years; a fine of the greater of $1,000,000 or twice the gross gain or loss; five (5) years of supervised release, forfeiture, restitution, and a $100.00 special assessment.  *See* PSR at 2.  Under the terms of the written plea agreement (Dkt. 7), Mr. Magee and the government agreed to recommend the application of the following United States Sentencing Guidelines ("U.S.S.G." of "Guidelines") provisions:

- A base offense level of 7, pursuant to U.S.S.G. § 2B1.1.

- An 18-level increase based on the total loss amount of $7,619,379, pursuant to U.S.S.G. § 2B1.1(b)(1)(J).

- A 2-level increase because the offense involved more than 10 victims, pursuant to U.S.S.G. § 2B1.1(b)(2)(A).

- A 2-level increase because the offense involved sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(10).

2

- A 2-level increase because Mr. Magee derived greater than $1,000,000 from a financial institution, pursuant to U.S.S.G. § 2B1.1(b)(16).

In addition to the above joint Guidelines recommendations, the United States agreed that "[I]f the defendant qualifies for a two-level decrease in offense level pursuant to U.S.S.G. §3E1.1(a) and the offense level prior to the operation of that section is a level 16 or greater, the government agrees to" move for "an additional one-level decrease in the defendant's offense level." Dkt. 7 at 3.[1]  Thus, a Guidelines calculation consistent with the recommendations contained in the plea agreement, results in a total offense level of 26, with a corresponding advisory range of *63-78 months of imprisonment*. *See* PSR at 37 (providing the same calculation should the Court accept Mr. Magee's recommended Guidelines calculation).

The PSR, however, has calculated a very different Guidelines range.  Rather than a total offense level of 26, the PSR has recommended a total offense level of 35, which corresponds to an advisory Sentencing Guidelines range of 168 to 210 months of incarceration. The Probation Officer's calculations include:

- a four-level (4) enhancement for Mr. Magee's alleged aggravated role in the offense pursuant to U.S.S.G. § 3B1.1(a).  *See id*. ¶95.

- a two-level (2) enhancement for obstruction of justice under § 3C1.1.  *Id*. at ¶96.

- and, as a result of the obstruction enhancement, the Probation Officer has declined to apply the two-level (2) reduction in the offense level for acceptance of responsibility.  *Id*. at ¶99.

---

[1] The Plea Agreement provides that the parties "have not agreed on any further sentencing issues" and that both parties are free to argue for or against any other Guidelines provisions.  *Id*. at 4.

As a result of the PSR's Guideline calculations, Mr. Magee's recommended advisory Guidelines range has increased nine levels (9) from the range recommended by the parties in Mr. Magee's plea agreement.[2] In all, the PSR's recommended advisory range results in a *105-month increase on the low end* of the Guidelines – from 63-78 months (offense level 26) to 168 to 210 months (offense level 35).    Mr. Magee respectfully disagrees with the PSR's Guidelines calculations and asks this Court to calculate the Guidelines range as recommended by the parties in the plea agreement.  In support of his position, Mr. Magee offers the following:

**A.  The Court Should Not Accept the PSR's Recommendation as to Role, Obstruction and Acceptance of Responsibility**

a.  <u>Role in the Offense</u>

Mr. Magee respectfully disagrees with the PSR's application of a four-level enhancement based on his role in the offense.  The PSR provides that Mr. Magee has been assessed the four-level enhancement because J.S. received direction from Mr. Magee in connection with his loan applications and because Mr. Magee approached Mr. Gilcher about obtaining his loans and created the false supporting documentation that Mr. Gilcher approved. The PSR also appears to place significant weight in imposing the 4-level enhancement based on the fact that Mr. Magee sent a text message to Mr. Gilcher on April 5, 2023, apologizing for getting Mr. Gilcher and J.S. involved and for taking advantage of them.  *See* PSR ¶82.   Because the offense was not "otherwise extensive" and because Mr. Magee did not "control" Mr. Gilcher or J.S., it would be improper to impose the recommended 4-level role enhancement.

---

[2] This includes the additional one-level reduction the government agreed to seek if Mr. Magee qualified for the two-level decrease for acceptance of responsibility.

###### i.      *Otherwise Extensive*

As an initial matter, the offense did not involve five or more "participants" because there were not five or more persons "criminally responsible" for Mr. Magee's offense.  *See* U.S.S.C. §3B1.1, cmt. n. 1. Thus, the four-level enhancement could only apply if the probation office found that Mr. Magee's criminal conspiracy was "otherwise extensive."  It should be noted at the outset that Mr. Magee did not plead guilty to conspiracy.  Mr. Gilcher, for his part, did.  However, any conspiracy between Mr. Gilcher and Mr. Magee involved only two loans that were distributed to Mr. Gilcher's company - ICS. While Mr. Magee did assist with applications for additional loans for companies owned or operated by J.S., to undersigned counsel's knowledge, J.S. has not been held criminally responsible for those loans.

Under the "otherwise extensive" theory, courts can consider "all persons involved during the course of the entire offense."  *See id*. at n. 3.  There appears to be no magic number as to when a conspiracy crosses the line into extensive – at least when it does not involve five criminally responsible participants.  *See United States v. Ruhbayan*, 406 F.3d 292, 302 (4th Cir. 2005) (finding that an offense that involved two criminally responsible participants as well as the services of another individual and his staff *was not* "otherwise extensive"); *see also United States v. Ellis*, 951 F.2d 580, 585 (4th Cir. 1991) (finding as extensive an offense involving four criminally responsible participants as well as "other lobbyists, legislators and their staffs.").  Mr. Magee will not pretend to know when and where that threshold is definitively crossed and it appears to be susceptible to arbitrary and/or outcome determinative interpretations.  Nevertheless, he submits that his criminal activity was not "extensive" primarily because it involved only one additional criminally responsible participant and while it did involve approximately 30 loans in total, only

two of the loans implicated another individual criminally and for the remaining loans Mr. Magee was acting solely for himself or by himself.

## ii.   *Leader, Organizer, or Manager*

While Mr. Magee acknowledges the wide latitude provided for the "otherwise extensive" interpretation under the Guidelines, he strongly disputes the PSR's conclusion on the narrower issue of whether he was an organizer or leader of the criminal activity.  Factors distinguishing a leadership or organizational role from lesser roles include the exercise of decision-making authority, the nature of the participation in the offense, recruitment of accomplices, the claimed right to a larger share of the proceeds, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised. U.S.S.G. § 3B1.1, cmt. n. 4.  Importantly, and according to Fourth Circuit law, a role adjustment can only be given under this section if the defendant had **control over others**:

> In *United States v. Cameron,* we recently explained that, in assessing whether a defendant played an aggravating role in the offense of conviction, the key inquiry is whether the defendant's role was that of "an *organizer or leader of people*," as opposed to that of a manager over the property, assets, or activities of a criminal organization. 573 F.3d 179, 185 (4th Cir.2009); *see also United States v. Sayles,* 296 F.3d 219, 226 (4th Cir.2002) (emphasizing that aggravating role adjustment is proper "only ... if it [was] demonstrated that [the defendant] was an organizer, leader, manager or supervisor *of people*"). Thus, the aggravating role adjustment is appropriate where the evidence demonstrates that the defendant "controlled the activities of other participants" or "exercised management responsibility." *United States v. Bartley,* 230 F.3d 667, 674 (4th Cir.2000).

*See United States v. Llamas*, 599 F.3d 381, 390 (4th Cir. 2010) (emphasis added); *see also United States v. Carter,* 300 F.3d 415, 426 (4th Cir. 2002).

Here, the facts contained in the PSR fail to establish that Mr. Magee managed or controlled the actions of anyone else, let alone any criminally responsible participants.  Indeed, the PSR only

generally refers to Mr. Magee as playing an "organizational role" and at no point provides a factual basis to support a finding that Mr. Magee controlled or directed the activities of others, which is what the Fourth Circuit requires.  Rather, it appears that Mr. Magee did all the work on the loans himself, without directing or ordering anyone else to play any role.  In fact, it appears that the only role any other individual played was to merely sign the application on behalf of their respective company. All of the above makes Mr. Magee guilty of wire fraud, true, but not a leader or organizer of others under § 3B1.1.

Moreover, the distribution of the proceeds of the loans demonstrates that when "others" were involved, the "others" received a larger share of funds.  It is true as the government has stated that Mr. Magee received all of the proceeds of the loans he carried out *for his own com*panies.  But the evidence establishes that Mr. Gilcher *received the majority* of the funds he fraudulently obtained and J.S. *received the entire portion* of the loans he obtained despite Mr. Magee's involvement in fabricating the applications and documents that were submitted in support of those loans. It has *never* been the case in counsel's experience that the manager/organizer/leader of criminal activity received *no* share of the proceeds (J.S. loans) or even *less than* the person he allegedly controlled and managed (Gilcher loans).

Lastly, the PSR supports its imposition of a 4-level role enhancement on a text message where Mr. Magee *apologized to Mr. Gilcher and took responsibility* for the trouble Mr. Gilcher and J.S. were in. What would in almost any other circumstance be viewed favorably as further evidence of acceptance of responsibility, the PSR instead uses *an apology* in order to increase a defendant's Guidelines range, if all other calculations remained the same, *by 60 months on the low-end*. Apologizing for his role in Mr. Gilcher's and J.S.'s loans and taking responsibility for that role does not make Mr. Magee a leader, manager, or organizer. Rather, it underscores the lack

of any other significant evidence to support such a consequential enhancement. An enhancement that, if imposed, would also deny Mr. Magee the ability to benefit from the new Guidelines section that would otherwise entitle him to an additional 2-level decrease in his sentencing range. *See* Section I.B. *infra*.

Application of a role enhancement under these circumstances is inappropriate and substantially weakens the legitimate purpose of distinguishing more culpable leaders of extensive and organized criminal conduct.

      b.  <u>Obstruction</u>

Mr. Magee objects to the two-level increase in his Total Offense Level based on an obstruction of justice. The enhancement is predicated on an unproven allegation made by Mr. Magee's co-defendant, Michael Gilcher, that he and Mr. Magee fabricated a lease agreement following the search of Mr. Magee's home in order to support their claim that Mr. Gilcher's payment to Mr. Magee after the award of two PPP loans reflected payments for past-owed rent as opposed to a kickback or commission. Mr. Magee maintains that the lease agreement in question was indeed drafted and signed in 2018, which would correspond with the time of the entry of other lease agreements between Mr. Magee's company, BRC, and other affiliated entities that leased portions of the warehouse through BRC's master lease. It is clear, however, that there is a dispute between Mr. Gilcher and Mr. Magee regarding the purpose of the payments from ICS to BRC following the award of the PPP loans. Importantly, and as noted in the PSR, Mr. Gilcher's story about that payment has changed from his initial interview with prosecutors and a subsequent interview that occurred *after* he had agreed to enter into a cooperation plea agreement and just days prior to the entry of that plea before this Court.

8

The dramatic change in Mr. Gilcher's story given his indisputable incentive to benefit from a potential sentence reduction based on his cooperation, particularly after he had told a different story to prosecutors in the presence of his counsel prior to the entry of the plea, is enough in and of itself to decline imposition of the enhancement. That is especially so when there has been no other fact or evidence offered to corroborate Mr. Gilcher's recent revelation.  That being said, the Court should decline to impose the obstruction enhancement not only because it is based on an uncorroborated questionable source but because *it also has no bearing on Mr. Magee's guilt* on the underlying offenses, something Mr. Magee has admitted to from the outset.

Whether or not ICS used a portion of its loan proceeds to pay back-rent or to pay Mr. Magee a commission for obtaining the loan, *no* amount of the loan was forgivable and it never should have been awarded in the first place.  Mr. Magee has acknowledged from the start, both in interviews with the government as well as in his Statement of Facts, that the ICS loan was based almost entirely on false information including fabricated payroll documents and tax documents that both Mr. Magee and Mr. Gilcher knew were false at the time they were submitted.

There is no dispute that at least some of the funds Mr. Magee fraudulently obtained during the course of his criminal conduct were used for permissible purposes under the PPP guidelines but even those funds have been included within the loss amount because they never should have been obtained in the first place. Therefore, even if Mr. Gilcher's most recent claims are true, any effort by Mr. Gilcher or Mr. Magee to justify how the funds were used has had no bearing on either's culpability, the loss amount, the restitution and forfeiture amounts, or whether the funds were *obtained* via fraudulent means.

Lastly as to applicability of this enhancement, to the extent the probation office is relying on untested statements by other individuals that Mr. Magee approached them about obtaining PPP

loans and paying a 50% commission for doing so, the facts are clear that Mr. Magee did not assist any other individual with obtaining a PPP loan other than Mr. Gilcher and J.S.  The amount Mr. Gilcher paid to Mr. Magee was over $100,000 *less than 50%* of the total loan amount so it does not appear from the available evidence that it was pursuant to a similar type of alleged proposed arrangement.  Moreover, the only other individual Mr. Magee assisted, J.S., obtained approximately $1,494,845.00 in PPP loan proceeds.  There is no evidence that J.S. paid Mr. Magee *any* commission related to the acquisition of his loan proceeds other than a nominal loan to BRC that post-dated the receipt of PPP loans.

Put simply, a dispute between two participants' versions of the offense in a fraud conspiracy is not unusual and not necessarily suggestive of obstruction, particularly when neither defendant denies wrongdoing but merely disagrees about the purpose of payments that do nothing to change their culpability. While the existence of that factual dispute might be relevant to the Court's overall analysis of what sentence to impose, it should not serve as the *sole* basis for a sentencing enhancement, especially when neither version exculpates either defendant or has had any bearing on the government's investigation.

c.   Acceptance

As noted in its sentencing memorandum, the government has asked this Court to grant Mr. Magee the two-level reduction for acceptance of responsibility and has also moved for an additional one-level reduction as provided for in the Plea Agreement.  Mr. Magee asks this Court to grant him the three-level reduction for acceptance based on the government's recommendation and in light of his overall cooperation since learning of the government's investigation.  In addition to admitting that all of the loans he applied for were based on fraudulent representations, Mr. Magee met with the government to detail his involvement prior to agreeing to plead guilty and

without any promises or understandings. Since his guilty plea, he has met with the government to provide access to his bank and crypto accounts in order to reach an agreement to resolve the government's potential civil claims against him and his companies.  That has included access not only to his crypto currency and brokerage accounts in the presence of agents and government attorneys but also tracking down information and communications relevant to financial transactions being investigated by the government.

Throughout the entire duration of these proceedings, Mr. Magee has not contested his guilt or called into question the veracity of his admissions and the extensive Statement of Facts. On the contrary, Mr. Magee has at all times made a good faith effort to resolve all claims, both criminal and civil, and has never denied responsibility for his actions.  Indeed, his efforts with regard to providing a complete financial accounting demonstrate his commitment to assisting the government's investigation – not obstructing it.

### B.  The Court Should Decrease Mr. Magee's Guidelines Range by an Additional 2-levels Based on the New Approved Guidelines that will Take Effect on November 1, 2023

As mentioned above, the U.S. Sentencing Commisssion has recently recommended several amendments to the Sentencing Guidelines that include a new two-level reduction for offenders who did not receive any criminal history points and meet the criteria set forth in U.S.S.G. § 4C1.1.[3] Section 4C1.1 becomes effective on November 1, 2023, and but for the erroneous role enhancement recommended by the PSR, Mr. Magee would otherwise qualify for the additional two-level reduction in his total offense level.  The Commission's decision to implement § 4C1.1 "was informed by its studies of recidivism among federal offenders, as well as other extensive data

---

[3] *See* Amendments to the Sentencing Guidelines (April 27, 2023) at 89, *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly--amendments/20 2305_RF.pdf.

analyses of offenders with no criminal history points, and public comment." *See id*. at 81.  Given the lack of any prior criminal history in Mr. Magee's background as well as his long record of service to the United States and his community, this Court should either reduce his total offense level by an additional two-levels in light of § 4C1.1 or vary downward from the advisory Guidelines range to reflect the Commission's findings and intent.

## II.     18 U.S.C. § 3553(A) FACTORS

In the post-*Booker* era, the sentencing court's duty is to consider all of the factors identified in 18 U.S.C. § 3553(a) and "impose a sentence sufficient, but not greater than necessary" to comply with the four purposes of sentencing set forth in the statute.  Pursuant to the statute, the sentence imposed must: (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (2) afford adequate deterrence to criminal conduct; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).  In addition, § 3553 requires the sentencing court to consider the following factors (in addition to the advisory Guidelines range and any pertinent policy statements issued by the Sentencing Commission) in imposing a sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant;  (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victim(s).  18 U.S.C. § 3553(a)(1)-(7).

Under § 3553, the advisory Guideline range receives no presumption of reasonableness, nor does any presumption of unreasonableness attach to a sentence that varies from the Guideline range.  *See Gall*, 522 U.S. at 50; *see also id*. at 52 ("It has been uniform and constant in the federal

judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") (quoting *Koon v. United States*, 518 U.S. 81, 98 (1996)). In the instant case, we submit that a sentence of probation with a period of home incarceration is appropriate after consideration of all of the § 3553(a) sentencing factors.

### A.  The Nature and Circumstances of the Offense

The nature and circumstances of Mr. Magee's offense are largely addressed in the offense conduct portion of the PSR as well as in the Statement of Facts submitted at the time of Mr. Magee's guilty plea.  However, for the purposes of determining a proper punishment, the Court should consider the additional information provided below - not to diminish Mr. Magee's responsibility, but to provide the proper context within which this Court must determine the appropriate sentence.

As detailed in the Statement of Facts and PSR, Mr. Magee's charged offense conduct occurred during a time when the country was in the midst of a global pandemic that threatened to indefinitely shut down businesses for months if not years.  The Court will recall the implementation of bans on public gatherings and the suspension of non-essential court proceedings among other restrictions. The measures taken to stop the spread of the COVID-19 virus threatened the viability of Mr. Magee's various companies and, as a result, he applied for available federal loan assistance on behalf of some but not all of his companies.

But as the Court also knows, he sought far more financial assistance than he or his companies were entitled to. The limitations placed on the potential financial relief offered by the government seemed unlikely to have the effect of saving Mr. Magee's suffering businesses. Instead of allowing them to fail, which he should have done, he engaged in fraud in order to justify

loans that far exceeded what would have been available to him had he submitted truthful applications. Mr. Magee used the majority of the PPP and EIDL loan proceeds to pay himself and other employees, as well as rent and lease payments necessary to keep the businesses operating. But he also used a portion of the funds for personal expenditures and to invest in crypto currency and other investments. He did so to maintain his home and family obligations and with the hope, and clearly improper belief, that he could use the PPP loans to generate additional income or revenue, which he could then use to strengthen and further expand his various business interests. Unlike many recent PPP loan prosecutions, Mr. Magee did not waste away proceeds on fancy cars and exotic vacations. And he did not create companies that did not previously exist to apply for relief.

Regardless of what might mitigate Mr. Magee's offense as compared to that of others, his conduct was plainly wrong and criminal. All of it. And while there is no good excuse, it appears that Mr. Magee, not unlike many others, responded to a crisis in a manner that was inconsistent with his upbringing and personal and professional ethics and morals out of fear and an inexcusable decision to turn the protection the PPP program was designed to provide into a business opportunity. And while it does not excuse his criminal behavior anymore than the "everyone else was doing it" defense would justify a reckless speeder, the Court should consider that Mr. Magee's conduct did not occur in a vacuum and he is far from the only offender.

Indeed, the Small Business Administration itself has estimated that it disbursed over $200 billion in potentially fraudulent loans related to pandemic relief – equating to a staggering 17 percent (at least) of all Covid-related EIDL and PPP loans. *See* SBA Fraud Landscape Three Pager *available at* https://www.sba.gov/sites/sbagov/files/2023-06/Fraud%20Landscape%20One-Pager%20June%202023.pdf. As a result, on March 10, 2022, the DOJ appointed an Associate

Deputy Attorney General as Director for COVID-19 Fraud Enforcement and reported prosecutions and civil enforcement proceedings that had *already* resulted in the prosecution of thousands of defendants with alleged losses exceeding $2 billion and investigations of fraud involving loans totaling more than $6 billion.  *See* DOJ Press Release, Justice Department Announces Director for COVID-19 Fraud Enforcement (March 10, 2022), *available at* https://www.justice.gov/opa/pr/justice-department-announces-director-covid-19-fraud-enforcement.

The recent and ongoing wave of PPP fraud prosecutions suggests that many Americans engaged in aberrant behavior to take advantage of what appeared to be free money with little to no deliberation as to their conduct or its consequences.  The pandemic in essence fueled a widespread abandonment of personal responsibility and accountability in exchange for immediate safety, security, and financial windfall.  Mr. Magee is no exception and he regrets the shortsightedness of his decisions and his decision to take advantage of the program in order to maintain and prop up his businesses and himself.

### B.  History and Characteristics of the Defendant

Mr. Magee's conduct in this case must be considered alongside the life he led and the contributions he made prior to the pandemic.  While there is no doubt that he took advantage of available pandemic relief, there is also no dispute that he grew up incredibly disadvantaged, and in many ways "beat the odds" for many who grew up as he did in a broken home with limited financial resources.  Mr. Magee's remarkable assent from low-income housing in Mississippi to his distinguished military career, substantial educational achievements, and his mentorship to so many youths and others in his community, is now, and forever will be, overshadowed by this case.

And while he must accept that this prosecution is as much of his story as any of his laudable achievements, the Court should also balance the harm he has caused against the good he has done.[4]

Among the history and characteristics this Court should consider, is Mr. Magee's service to the country through his voluntary enlistment in the U.S. Army at the age of 18.  Mr. Magee served for a combined 16 years between 5 years of active duty and 11 years in the Army Reserves and Army National Guard.  He served with distinction and received several awards during his time in the military.  His devotion to being an honorable service member is exemplified by the fact that Mr. Magee was selected to serve in the prestigious Old Guard, the First Presidential Honor Guard, and as a Sentinel of the Tomb of the Uknown Soldier.[5]

Some of the men Mr. Magee served with have written letters to the Court on his behalf. Darin Thatcher served alongside Mr. Magee in the Honor Guard and at the Tomb of the Unknown Soldier.  *See* Exhibit 1 (Letter from Darin Thatcher).[6] According to Mr. Thatcher, only the top 1% of active-duty soldiers are chosen to serve in the Honor Guard and only the top 1% of those who served in the Honor Guard "are selected to serve as Sentinels at the Tomb of the Unknown Soldier."  *Id*.  He has remained lifelong friends with Mr. Magee and writes that Mr. Magee "was without doubt one of the best men I knew and was very proud to serve with him and call him my friend."  *Id*.  Even putting aside his military service, he describes Mr. Magee as the "gold standard"

---

[4] *See United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) ("But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'").

[6] All of the letters submitted on Mr. Magee's behalf have been consolidated and filed as Exhibit 1 to this Motion.

of a family man and "a guiding force to whoever has the privilege to be around and call him boss, friend, father and husband." *Id*.

Craig Carnell similarly served with Mr. Magee in the Honor Guard and writes to the Court about Mr. Magee's leadership and the impact he had on him and others. Troy Foreman writes about how he became friends with Mr. Magee when they were both stationed at Fort Myer and Mr. Magee was serving at the Tomb of the Unknown Soldier. Echoing what many others have written to the Court, Mr. Foreman recounts how "[d]uring the time I have known Ben, he has shown what it is like to be a true friend. When I was in a tight spot financially, Ben was there to lend me assistance. When one of my family members had a medical issue and the bills were piling up, Ben helped me in paying down some of those bills." *Id*.

Mr. Magee's generosity and mentorship is not limited to old Army friends. The Court has received numerous letters from friends, family, business partners, and neighbors documenting Mr. Magee's well-known reputation for kind acts and helping those in need, whether financial or otherwise. He has employed friends who needed work as well as friends of his children who were just starting out in their careers. He has been a "second father" and "father figure" to young people like Andrew Barbour, Camille Sanchez, and George Nichols. *See id*. He has also played a very active role in the lives of his four children through coaching their youth teams and volunteering at their schools and other community events. *Id*. (Letter from Marjorie Lillis).

He has also steadfastly stood by friends and acquaintances who were going through difficult times. Raushi Conrad writes about how Mr. Magee offered him encouragement and a job after he was convicted and served 48 months for a fraud conviction in the Eastern District of Virginia. In addition to helping Mr. Conrad get back on his feet, Mr. Conrad shares that Mr. Magee paid the rent, household expenses, and the remaining balance on a vehicle loan for an employee of

one of his companies who was on the verge of losing his home.  *Id*.  He also describes how Mr. Magee volunteered warehouse space and staff to help a local church deliver food during the pandemic.

In all, the letters are remarkable in that they demonstrate that Mr. Magee has truly had a meaningful and positive impact on his community. Family and community are clearly important to him and he has fulfilled what he believes is his obligation as a citizen to share his life experiences and resources with those who would benefit.  That well- and long-earned reputation has now been called into question by the instant case but his commitment to making an impact on other lives has not and will not waver. The Court should expect that Mr. Magee will serve his punishment honorably and without complaint. And that he will find a way to further make a positive contribution to his community as a result of his criminal conduct.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

Mr. Magee acknowledges that he has committed a serious offense and must suffer the consequences of his actions.  The requested sentence of 48 months sufficiently accounts for this important sentencing consideration. For the reasons outlined in the disparity analysis below, 48 months will provide just punishment for Mr. Magee's offense as balanced against other sentences recently imposed in similar cases and when balanced against all of the factors this Court must consider.

### D. Afford Adequate Deterrence to Criminal Conduct and Protect the Public from Future Crimes of the Defendant

Mr. Magee appears to be at low risk of reoffending based on available objective empirical evidence. According to the United States Sentencing Commission, a male Criminal History Category I offender over the age of 50, like Mr. Magee, has a historical general recidivism rate of

6.2%, which is *the lowest reported recidivist rate* in the Commission's study.[7]   The general

recidivist rates coupled with Mr. Magee's history and personal characteristics leave little doubt

that he will not reoffend and strongly militate in favor of a substantial variance from the advisory

Guideline range.[8]

Although general deterrence remains a required consideration under § 3553(a), there is

little evidence to support a finding that harsh sentences deter future criminal conduct.  The unique

combination of motivation and circumstance that lead otherwise law abiding citizens to risk

imprisonment are not so easily overcome by the simple imposition of lengthy sentences.  While

such a theory might be appealing on its face, the reality is that that there is little to no difference

in the deterrent effect between probation and imprisonment. *See* Francis T. Cullen *et al.*, *Prisons

Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 PRISON J. 48S, 50S-51S (2011)

(according to "the best available evidence…prisons do not reduce recidivism more than

noncustodial sanctions"); *see also* Michael Tonry, *Purposes and Functions of Sentencing*, 34

Crime & Just. 1, 28 (2006) ("increases in severity of punishments do not yield significant (if any)

marginal deterrent effects.").  Indeed, available research suggests that the certainty of being caught

---

[7] *See* U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 28 Ex. 9 (2004) (listing the recidivism rates for various types of offenders and considering demographics such as gender, age, race, drug use, marital status, etc.), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

[8] *See United States v. Darway*, 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first offender status); *United States v. Urbina*, slip op., 2009 WL 565485, *3 (E.D. Wis. 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history and strong family ties); *See, e.g.*, *United States v. Huckins*, 529 F.3d 1312, 1318-19 (10th Cir. 2008) (a district court "may weigh a defendant's lack of a criminal record" in deciding whether to grant a downward variance from the advisory Guidelines range "even when the defendant has been placed into a criminal history category of I"); *United States v. Smith,* 2008 WL 1816564 *4 (4th Cir. 2008) (affirming downward variance based in part on the defendant's "exemplary life" and lack of a criminal history).

and punished carries for greater deterrent effect than the *severity* of the punishment.  *See id*. ("Three National Academy of Science panels…reached that conclusion, as has every major survey of the evidence.").[9]  Moreover, there is a moral limit on the extent to which the need for general deterrence can or should be heaped on the shoulders of one person.  *See United States v. Meyers*, 353 F. Supp. 2d 1026, 1029 n. 1 (S.D. Iowa 2005) ("…the weight of society's need to send a message to potential wrongdoers can only be borne to a limited extent by one individual."); *see also* Paul H. Robinson, *Distributive Principles of Criminal Law*, at 223 (2008) (noting potential ethical objection to overemphasis on general deterrence, which "relies on treating the person being punished as a mere instrument by which to influence the conduct of others").

Nevertheless, the sentence proposed in this case will serve as an appropriate deterrent for those who would consider engaging in conduct similar to that of Mr. Magee.

### E.  The Need to Avoid Unwarranted Sentencing Disparity

Sentences imposed in this district for recent PPP fraud cases demonstrate that imposition of a 48-month sentence will avoid unwarranted sentencing disparity. They also highlight the arbitrary and inconsistent application of various Guidelines enhancements.  Most notable perhaps,

---

[9] S*ee also* David Weisburd *et al*., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 CRIMINOLOGY 587 (1995); *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 CARDOZO J. CONFLICT RESOL. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."); *see also* Symposium, U.S.S.C., Federal Sentencing Policy for Economic Crimes and New Technology Offenses, Plenary Session I, "What Social Science Can Contribute to Sentencing Policy for Economic Crimes," at 22 (Oct. 12, 2000) ("One consistent finding in the deterrent literature is that the certainty rather than the severity of punishment seems to be the most effective deterrent."), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/economic-crimes/20001012-symposium/cPlenaryI.pdf.

on both points, is the recent case of *United States v. Quin Ngoc Rudin* (Case No. 1:22-cr-00046-AJT).

According to the Government's sentencing memorandum, Rudin was released from prison in 2018 after having served five years "for a massive fraud scheme" that resulted in a restitution judgment of ***$39,943,267.71.*** (Dkt. 54 at 1). *While on supervised release* for his previous fraud conviction, "the defendant almost immediately embarked on another." *Id*. First, the defendant, through his company, Mana Tax, "assisted in the preparation and filing of false tax returns on behalf of a number of professional athletes that reported fabricated business losses and other false items to support large tax refund claims from the IRS to which the athletes were not entitled." *Id*. at 2. The defendant's actions resulted in over ***$19,000,000 in loss*** to the government and Rudin collected for himself 30% of the illegal refunds that were obtained as part of the conspiracy. *Id*. at 4-5. In addition, through the use of Mana Tax, Rudin also assisted clients in the filing of approximately 80 fraudulent PPP loan applications that resulted in a ***loss amount of $43,810,330***, and to which he was also entitled to 30% of the proceeds. *Id*.

Despite the fact that Rudin decided how to prepare the tax returns, supervised others including his own family members, recruited small business owners for the PPP fraud, and instructed others on how to prepare and file the loan applications, the government agreed to a 3-level role enhancement rather than the 4-level enhancement recommended by the PSR. *Id*. at 8-10. Remarkably, neither the government nor the probation office sought a 2-level increase for the use of sophisticated means even though the evidence overwhelmingly supported the enhancement and the PPP fraud was carried out almost identically as that in the instant case, including the use of false tax forms and payroll documents. *Id*.

Despite Rudin qualifying for a criminal history category III and despite the fact he caused a combined loss in excess of $60,000,000 the Guidelines agreed to by the parties recommended a sentence of 108-135 months.  Even the disputed Guidelines as calculated by the probation office (151-188 months) were *less than* what the probation office has recommended in Mr. Magee's case (168-210 months). Rudin was ultimately sentenced to two consecutive 60-month terms of imprisonment.  (Dkt. 63).

Perhaps no comparison better illustrates the limitations of the Sentencing Guidelines than that between Rudin's case and Mr. Magee's.  Rudin's offense conduct was unquestionably more widespread, serious, harmful, and began almost immediately after his release from a five-year sentence on fraud charges. Yet his faced and advisory Guidelines range of 108-135 months.  Mr. Magee's conduct on the other hand involved only one scheme, was much shorter in duration, caused a loss amount almost $1/10^{th}$ less that Rudin's, and represented Mr. Magee's first criminal offense.  Despite those dramatic differences, somehow the Probation Office has recommended a Guidelines range far in excess of that found in Rudin.

No reasonable person comparing the facts in Mr. Magee's and Rudin's cases could even remotely suggest or justify the position that they should be sentenced similarly. And, if Congress's directive to avoid unwarranted sentencing disparity is to be followed, Mr. Magee's sentence must *at least* be less than half of Rudin's in order to comply with § 3553(a).

In another recent case, *United States v. Jaafar*, Case No. 1:20-cr-00185-CMH, the defendant and his wife filed 18 fraudulent PPP loan applications despite not owning any active or operating businesses.  (Dkt. 60 at 6).  Upon being informed that they were the targets of a criminal investigation, the defendant and his wife attempted to flee the country (after having previously met with prosecutors) and were arrested at John F. Kennedy airport in possession of multiple passports,

18 bags, 14 cell phones, and $49,875.65 in cash. *Id.* at 4. Neither defendant received an enhancement for use of sophisticated means, despite using the same means used by Mr. Magee to carry out the fraud and despite the fact that, unlike Mr. Magee, they did not in fact own any legitimate companies. Highlighting again the arbitrary application of the Guidelines, neither defendant received an obstruction of justice enhancement despite *being caught attempting to flee prosecution, and thereby justice, entirely.* Based on an intended loss of $6.6 million, the Guidelines recommended a sentence of 24-30 months and Mr. Jaafar was ultimately sentenced to 12 months of incarceration. (Dkt. 67).

Other cases in this District lend support for Mr. Magee's recommendation for a 48-month sentence. In *United States v. Kindambu*, Case No. 1:20-cr-260, the defendant obtained over $2.5 million in PPP loan proceeds and spent a significant portion of the funds on illegitimate expenditures including on personal taxes, a luxury vehicle, a Cessna aircraft, and a luxury residence. Despite engaging in conduct similar to that of Mr. Magee, neither the plea agreement nor the PSR recommended an enhancement for the use of sophisticated means. (Dkt. 39). The Guidelines recommended a sentencing range of 41-51 months and the defendant was ultimately sentenced to serve 33 months of incarceration. (Dkt. 64).

In *United States v. Darakshan*, Case No. 1:21-cr-267-LO, the defendant and his family members filed 63 loan applications on behalf of 14 different entities and obtained over $3,000,000 in fraudulent loan proceeds. Neither the government nor the Probation Office recommended an enhancement for the use of sophisticated means. And, despite the fact that the defendant appeared to be the head of a criminal enterprise involving more than 5 participants, and despite the recommendation of a four-level enhancement by both the government and the probation officer, the Court declined to impose the role enhancement because the defendant did not exercise control

23

over the other participants, even if he played a larger role and at times gave instructions or direction.  (Dkt. 21 at 9-10).  As a result, the Court found a total offense level of 21 as opposed to the recommended level of 25.  (Dkts. 14, 15, and 19).  As calculated, the Guidelines recommended a range of 37-46 months and the defendant was ultimately sentenced to serve 33 months of incarceration.

Mr. Magee respectfully submits that the foregoing sentences imposed on defendants guilty of committing PPP loan fraud support the requested sentence of 48 months.  Imposition of a longer sentence will create unwarranted disparity and run contrary to the spirit and intent of 18 U.S.C. § 3553(a).

WHEREFORE based on the foregoing reasons and any others that may appear to the Court or that may develop at the sentencing hearing, Mr. Magee respectfully requests that this Honorable Court sentence him to 48-months incarceration.

Respectfully submitted,

BENNIE EARL MAGEE,
By Counsel

/s/ Stuart A. Sears
Stuart A. Sears
VA Bar 71436
*Attorney for Bennie Earl Magee*
SCHERTLER ONORATO MEAD & SEARS, LLP
555 13th Street, NW
Washington, DC  20004
Telephone:  (202) 628-4199
Facsimile:  (202) 628-4177
ssears@schertlerlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day September 2023, I electronically filed a true copy of the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all parties.

/s/ Stuart A. Sears
Stuart A. Sears
VA Bar 71436
*Attorney for Bennie Earl Magee*
SCHERTLER ONORATO MEAD & SEARS, LLP
555 13th Street, NW
Washington, DC  20004
Telephone: (202) 628-4199
Facsimile: (202) 628-4177
ssears@schertlerlaw.com